IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **MICHAEL ENGLES**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Civil No. **08-914-CJP**[1] |
| | ) | |
| **COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

**PROUD, Magistrate Judge:**

Pursuant to 42 U.S.C. § 405(g), plaintiff Michael Engles, represented by counsel, is before the Court seeking review of the final decision of the Social Security Administration denying him Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423, or even a Period of Disability (POD) pursuant to 42 U.S.C. § 416(i).  (Doc. 2.)  In addition to submitting the administrative record (Docs. 11 and 21), plaintiff and defendant have fully briefed their positions.  (Docs. 14 and 20.)

Plaintiff Engles' physical ailments are not in dispute, *per se*.  Rather, this appeal centers around the sufficiency of the evidence and legal analysis by Administrative Law Judge ("ALJ") Joseph W. Warzycki.  Plaintiff claims ALJ Warzycki's finding that plaintiff is not disabled is not supported by substantial evidence.  More specifically, plaintiff argues:

---

[1]In accordance with 28 U.S.C. § 636(c), the parties consented to have all proceedings, including entry of judgment, conducted by a Magistrate Judge.  (Docs. 12 and 15.) Consequently, U.S. District Judge G. Patrick Murphy referred this action to the undersigned Magistrate Judge.  (Doc. 16.)

1.      The ALJ failed to reasonably evaluate the opinion of plaintiff's treating physician, Dr. Kennedy and evidence from other treating physicians;

2.      The ALJ improperly evaluated plaintiff's testimony, concluding plaintiff was not fully credible; and

3.      The ALJ improperly found that the Social Security Administration had met its burden of proof regarding plaintiff's ability to perform other work.

(Doc. 14.)

## Overview of the Evidence

Plaintiff applied for DIB on November 17, 2006, alleging the onset of disability as of October 17, 2005,  after a workplace injury to his neck and left shoulder.  (Doc. 11-5, p. 2; Doc. 11-2, p. 28.)  At the time of alleged onset, plaintiff was 38 years old; 41 years old at the time of decision.  (*See* Doc. 11-5, p. 2; Doc. 11-2, p. 23.)  Plaintiff has a GED and last worked as a heavy equipment operator for the telephone company.  (Doc. 11-2, pp. 27-28.)  From a vocational perspective, that work is heavy/unskilled and heavy/semi-skilled, as performed. (Doc. 11-2, pp. 41-42.)  Plaintiff stopped working on October 17, 2005, and has not worked since then.

Although plaintiff Engles claims that his disability commenced October 17, 2005, plaintiff's medical history leading up to that point will be summarized in order to place plaintiff's ailments in context.  In March 2003, plaintiff had a cervical discectomy, anterior fusion and plating at C4-C5.  (Doc. 11-7, p. 27.)  Two months later, in May 2003, plaintiff was released to return to work on regular duty.  (Doc. 11-7, pp. 46-47.)  In July 2003, plaintiff, who is right handed,  underwent arthroscopic surgery on his left shoulder to repair a subacromial impingement.  (Doc. 11-7, p. 2; Doc. 11-2, p. 23.)  Within two months, he was again released to

return to work, without restriction.  (Doc. 11-7, pp. 66-67.)  Plaintiff's 2003 anterior fusion

turned out to be a non-fusion, and in March 2004, he underwent a posterior fusion at C4-C5.

(Doc. 11-8, p. 3.)  Approximately four and a half months later, plaintiff returned to work,

without restriction.  (Doc. 11-14, p. 12.)  Three months later, in November 2004, plaintiff

aggravated his cervical spine and had to stop working while he underwent triggerpoint injections

and other treatment.  (Doc. 11-14, pp. 8 and 14-15.)  Plaintiff did not return to work again until

June 9, 2005– again, with no restrictions.  (Doc. 11-10, p. 33.)  At that time, plaintiff was

described as experiencing minimal discomfort; his range of motion was "essentially normal; and

he could lift 67 pounds repeatedly.  (Doc. 11-14, p. 24.)  Plaintiff was also discharged from

physical therapy in August 2005, at which time he rated his pain as 3 or 4 on a 10-scale with

medication, and 7 to 8 without medication.  (Doc. 11-10, p. 70.)   On September 28, 2005, Dr.

David G. Kennedy, plaintiff's treating orthopaedist, opined that plaintiff had 20% permanent

partial disability.  (Doc. 11-14, p. 27.)  Plaintiff has not claimed that he was disabled in relation

to the aforementioned surgeries.

Plaintiff was injured at work on October 17, 2005, and was unable to work; he returned

to his orthopaedist on October 27, 2005.  (Doc. 11-10, p. 32.)  In November and December of

2005, Dr. Rachel Feinberg treated plaintiff primarily for purposes of relieving plaintiff's neck

pain, which was radiating down into plaintiff's arms and between his shoulder blades.  (Doc. 11-

10, pp. 66-68.)  Dr. Feinberg administered cervical epidural steroid injections.  (Doc. 11-10, pp.

68.)  Dr. Feinberg noted that plaintiff was "scared out of his mind," thinking that he was going to

lose his house and cars because he was not working.  (Doc. 11-10, p. 67.)  In March 2006, Dr.

Feinberg described plaintiff as being "almost borderline suicidal," and becoming progressively

more depressed.  (Doc. 11-10, p. 65.)

In May 2006, Dr. Kennedy performed a discectomy and fusion at C6-C7, and consequently had to plate C4-C7, joining the two fusions and the intermediate spinal segment. (Doc. 11-10, pp. 30 and 47-48.)  Two weeks later, plaintiff was permitted to drive; his strength was intact, but he was to remain off work.  (Doc. 11-10, p. 28.)  Plaintiff has never returned to work after the October 17, 2005, injury and May 2006 surgery.

On June 27, 2006, approximately two months after surgery, plaintiff was experiencing only minimal pain at the base of his cervical spine; his mobility was slightly reduced relative to rotation; and his strength and sensation were intact.  (Doc. 11-10, p. 27.)  Plaintiff was to engage in physical therapy and remain off work.  (Doc. 11-10, p. 27.)  Plaintiff was taking Percocet. (Doc. 11-10, p. 63.)  By mid-September, Dr. Kennedy described plaintiff's range of motion as "fairly good" and motor and sensory exams were normal. (Doc. 11-10, p. 25.)  Plaintiff was still in pain, but no longer using pain medication; Dr. Kennedy referred plaintiff to Dr. Rachel Feinberg.  (Doc. 11-10, p. 25.)

In late September 2006, Dr. Feinberg administered nerve block and thoracic facet injections to relieve the pain plaintiff was experiencing above and below the fusion site.  (Doc. 11-10, p. 62.)   Approximately three weeks later, plaintiff was still in pain and was also experiencing headaches.  (Doc. 11-10, p. 57.)  Dr. Feinberg commenced radio frequency ablation at C1-C7.  (Doc. 11-10, p. 57.)  Plaintiff's pain persisted, and in late November 2006 he went to the emergency room due to neck pain.  (Doc. 11-10, pp. 53-54.)  After additional radio frequency treatments, plaintiff's headaches ceased, but as of December 2006 plaintiff remained in pain. (Doc. 11-10, p. 52.)  According to Dr. Kennedy's December 21, 2006, notes, plaintiff was

"generally better," but still experiencing some pain at C7-T1; plaintiff's strength was intact; motor and sensory tests were normal; and x-rays showed satisfactory progression of the fusion. (Doc. 11-14, p. 47.)  Plaintiff was directed to remain off work.  (Doc. 11-14, p. 47.)

Plaintiff's wife reported in December 2006 that plaintiff paid the bills and managed the family's checkbook and savings account.  (Doc. 11-6, p. 21.)  According to Mrs. Engles, plaintiff had no difficulty getting along with her or others, but his social activities were limited by his pain and need to lie down.  (Doc. 11-6, p. 22.)  Mrs. Engles also reported that plaintiff was able to pay attention for "hours," but he often begins tasks and does not complete them.  (Doc. 11-6, p. 22.)  She also stated that plaintiff follows instructions "just fine."  (Doc. 11-6, p. 22.)

On February 7, 2007, Dr. Kennedy noted that plaintiff was still experiencing "quite a bit of pain," that was relieved by lying down.  (Doc. 11-14, p. 48.)  Plaintiff was directed to continue treatment with Dr. Feinberg.  (Doc. 11-14, p. 48.)  A week later, Dr. Raymond Leung, M.D., performed a consultative examination.  Plaintiff reported to Dr. Leung that his neck pain was non-radiating, helped by medication.  (Doc. 11-14, p. 129.)  Plaintiff estimated that he could walk one block and lift no more than 5 pounds.  (Doc. 11-14, p. 129.)  Dr. Leung found plaintiff's memory and ability to concentrate to be within normal limits, and plaintiff was characterized as being "fairly cooperative."  (Doc. 11-14, p. 130.)  Plaintiff's gait was within normal limits, and he was walking unassisted.  (Doc. 11-14, p. 131.)  Plaintiff demonstrated no difficulty getting on and off the examination table, or getting up from a chair.  (Doc. 11-14, p. 131.)  Plaintiff's left arm strength was 4+/5; the right arm was 5/5.  (Doc. 11-14, p. 131.)  Plaintiff did have a decreased range of motion in his neck:  lateral flexion was limited to 10° to the right and 5° to the left; flexion and extension were limited to 5°; rotation was limited to 20°

in each direction.  (Doc. 11-14, p. 131.)  Also, flexion in the left shoulder was limited to 85°.

(Doc. 11-14, p. 131.)  Furthermore, at that time, plaintiff's blood pressure was deemed "high" at

137/109.  Dr. Leung speculated that plaintiff's pain could cause him difficulty with prolonged

walking, climbing, bending, squatting and lifting; and plaintiff may have difficulty reaching

overhead with his left arm.  (Doc. 11-14, p. 131.)

 Agency physician Young-Ja Kim, M.D., issued a Residual Functional Capacity ("RFC")

Assessment on March 7, 2007, based on a record review.  Plaintiff's cervical fusion, depression

and hypertension were all recognized.  (Doc. 21-1, pp. 2 and 9.)  Dr. Kim concluded that plaintiff

was capable of lifting 10 pounds frequently and 20 pounds occasionally, standing, sitting or

walking for six hours out of an eight hour workday, but his ability to reach overhead was limited,

and he was limited to only occasional climbing.  (Doc. 21-1, pp. 3-5.)  Dr. Charles Kenney,

M.D., an Agency consulting physician, reviewed Dr. Kim's assessment and concurred.  (Doc.

21-1, pp. 19-20.)

 On March 21, 2007, Dr. Kennedy, plaintiff's orthopaedist, offered an assessment.

Plaintiff's persistent pain at the base of the cervical spine (with focal tenderness) was noted; and,

according to Dr. Kennedy,  plaintiff could sit or stand for no more than an hour at a time, and

plaintiff would subsequently need to lie down for five to ten minutes; plaintiff could lift no more

than 10 pounds; overhead lifting was precluded; and plaintiff was limited to "occasionally"

performing activities involving cervical extension.  (Doc. 21-1, 16.)  Dr. Kennedy characterized

plaintiff as having reached a "plateau in terms of improvement," and the doctor further opined

that, given the aforementioned restrictions and plaintiff's chronic pain, plaintiff could not return

to his former work and was unlikely to be employed in any gainful capacity.  (Doc. 21-1, p. 16.)

Relative to plaintiff's psychological state, in February 2007, psychologist Dr. Stephen G. Vincent, Ph.D., performed a consultative evaluation.  According to Dr. Vincent, plaintiff described being in constant pain, which he would rate at 7 to 8 on a 10-scale, even with medication.  (Doc. 11-14, pp. 125-126.)  Plaintiff reported no psychiatric or psychological treatment, but he indicated he had tried antidepressants– Doxepin and Cymbalta– but they were ineffective.  (Doc. 11-14, p. 126.)  Plaintiff reported no present depression, although he was frustrated by his inability to return to work due to chronic pain.  (Doc. 11-14, p. 125.)  According to plaintiff, he had trouble sleeping; he also had trouble being around others due to irritability and agitation.  (Doc. 11-14, p. 126.)  Plaintiff denied trouble with concentration or memory, but stated, "[S] sometimes I'm just slow because I'm tired and I'm hurting."  (Doc. 11-14, p. 126.)

Testing reflected that plaintiff had a "mildly depressed" mood and affect; his thought processes were slow and deliberate, but logical, coherent and relevant.  (Doc. 11-14, p. 126.)  Plaintiff had no difficulties relating to Dr. Vincent.  (Doc. 11-14, p. 126.)  Dr. Vincent observed that plaintiff had difficulty sitting for any length of time, but not to a degree that interfered with plaintiff's ability to focus and persist on task.  (Doc. 11-14, p. 126.)  Dr. Vincent concluded that plaintiff was cognitively intact, but he had a mood disorder secondary to his general medical condition, with major depressive-like features; and he had a pain disorder with both psychological and general medical aspects.  (Doc. 11-14, p. 127.)

Agency psychologist Dr. Tyrone Hollerauer, concluded– after a record review and based on a diagnosis of depression secondary to his medical conditions, and chronic pain with both physical and psychological aspects– that plaintiff's activities of daily living would be moderately limited; and he would have mild difficulty maintaining social functioning, moderate difficulty

maintaining concentration, persistence and pace.  (Doc. 11-14, pp. 137, 140, 144 and 146.)  It was also noted that plaintiff had had no episodes of decompensation.  (Doc. 11-14, p. 144.)  In terms of RFC, Dr. Hollerauer found that plaintiff was not significantly limited in any respect, except for moderate limitations relative to the following:  his ability to read, understand and carry out detailed instructions; maintaining concentration for extended periods; performing activities within a schedule; sustained concentration and persistence; and, his ability to travel to unfamiliar places or use public transportation.  (Doc. 11-14, p. 148.)  Dr. Hollerauer opined that plaintiff would have difficulty with absenteeism secondary to perceived and real pain and depression.  (Doc. 11-14, p. 150.)  Also, Dr. Holllerauer would limit plaintiff to unskilled tasks.  (Doc. 11-14, p. 150.)  Dr. Charles Kenney, M.D., an Agency consulting physician, reviewed Dr. Hollerauer's Psychiatric Review Technique form and his RFC  assessment and concurred.  (Doc. 21-1, pp. 19-20.)

An evidentiary hearing was conducted before ALJ Warzicki on July 16, 2008.  Plaintiff described his daily activities, which include showering, cooking simplistic breakfasts and lunches for himself, occasional grocery shopping with his wife (but carrying nothing more than 10 pounds), watching talk shows on television and reading.  (Doc. 11-2, pp. 30-31.)  Plaintiff explained that he cannot perform certain household chores, such as vacuuming or sweeping, due to the vibration and push-pull movement required.  (Doc. 11-2, p. 30.)  According to plaintiff, he relates well with his wife, family and neighbors.  (Doc. 11-2, p. 31.)

At the time of the hearing, plaintiff was taking medication to help him sleep, Percocet for pain, and occasionally Extra Strength Tylenol.  (Doc. 11-2, p. 34.)  Plaintiff described his neck pain as usually 8 on a 10-scale, but 5 to 6 with Percocet.  (Doc. 11-2, p. 35.)  Percocet makes

plaintiff drowsy.  (Doc. 11-2, p. 36.)  Plaintiff reported that lying down relieves his neck pain.  (Doc. 11-2, p. 35.)  Plaintiff also takes medication for hypertension, which he described as controlling the problem.  (Doc. 11-2, p. 35.)  Plaintiff had previously taken antidepressants, but they did not help him; he is still depressed, but not being treated in any way.  (Doc. 11-2, pp. 36-37.)

According to plaintiff, his pain affects his ability to concentrate and to sleep.  (Doc. 11-2, pp. 37-39.)  Sitting, standing or walking for long periods (one hour) causes neck pain.  (Doc. 11-2, p. 38.)  Plaintiff estimated that he could walk a quarter of a mile and lift up to 10 pounds.  (Doc. 11-2, p. 38.)  Plaintiff stated that he has no trouble with his right arm, and he has no trouble reaching.   (Doc. 11-2, p. 40.)

Vocational evidence was offered in the form of a November 2007 report from vocational expert James E. Israel, and vocational expert Brenda Young testified at the evidentiary hearing. Israel's evaluation was based on a review of the medical records, Dr. Kennedy's opinion, Dr. Vincent's psychological evaluation, vocational testing and plaintiff's subjective report of his abilities.  (Doc. 11-6, pp. 56-59 and 62.)   Israel would limit plaintiff to tasks that: (1) permit reduced persistence and pace; (2) do not require sitting or standing for long periods (1 hour); (3) permit plaintiff to lie down for 5-10 minutes after prolonged sitting or standing; (4) do not require lifting more than 10 pounds; and (5) do not demand overhead lifting or more than occasional cervical extension.  (Doc. 11-6, p. 62.)  Israel opined that the aforementioned restrictions would preclude work in all strength categories, except some sedentary or light work. (Doc. 11-6, 62.)  However, the combined disabilities and pain impose such limits that plaintiff cannot compete in the open labor market.  (Doc. 11-6, p. 63.)

During the evidentiary hearing, various hypotheticals were posed to vocational expert Brenda Young.  The first hypothetical was based on a person with plaintiff's age, education and work experience, albeit with no transferable skills, and assumed the residual functional capacity for light work, but with no more than occasional use of ladders, ropes and scaffolds, and further limited that person to simple, repetitive tasks and instructions.  (Doc. 11-2, p. 42.)  Young opined that plaintiff's past work would be eliminated, but light, unskilled jobs, such as cashier, would be available, (Doc. 11-2, p. 43.)  A second, similar hypothetical was posed, which reduced the residual functional capacity to sedentary work.  (Doc. 11-2, p. 43.)  According to Young, such a person could still perform assembly bench work and small products assembly jobs.  (Doc. 11-2, p. 44.)  Young indicated there were 2,500 such sedentary jobs available in the St. Louis metropolitan area.  (Doc. 11-2, p. 44.)  Plaintiff's counsel posed a third hypothetical, based on Dr. Kennedy's RFC assessment, which precluded lifting over 10 pounds and overhead lifting, and limited sitting and standing to no more than one hour and required the opportunity to lie down.  (Doc. 11-2, pp. 44-45.)  According to Young, those added restrictions would preclude all light or sedentary jobs.  (Doc. 11-2, p. 45.)

## ALJ Warzycki's Decision

ALJ Warzycki issued his opinion on September 19, 2008.  (Doc. 11-2, pp. 9-18.) Plaintiff was found to be "not disabled" at any point during the relevant time period.  The ALJ found plaintiff's testimony regarding his activities of daily living to be inconsistent with his treatment history, the medical evidence and plaintiff's wife's statement, and therefore not fully credible.   The ALJ highlighted that plaintiff's strength and his motor and sensory abilities were deemed normal by his doctors shortly after the October 2005 injury, and again shortly after the

May 2006 fusion.  With respect to Dr. Vincent and Dr. Leung's consultative exams, the ALJ honed in on the fact that the doctors' personal observations did not reflect any dramatic affects.

The ALJ did find that plaintiff's back impairments and his affective mood disorder were "severe" impairments, but plaintiff's affective mood disorder was not persistent.  None of the impairments were found to meet the criteria to be considered presumptively disabling. Plaintiff's hypertension was discounted, because his diastolic pressure was under 100 and because plaintiff had testified that his blood pressure was controlled with medication.

Based on the observations of Drs. Leung and Vincent, the ALJ found moderate limitations on plaintiff's activities of daily living, slight limitations on social functioning, moderate limitations on concentration, persistence and pace.  Plaintiff was found capable of performing simple, repetitive and routine unskilled work.  In terms of residual functional capacity, plaintiff was deemed capable of lifting and carrying up to 10 pounds; sitting, standing and walking for six hours out of an eight hour work day, but plaintiff was limited to no more than occasionally climbing ladders, ropes and scaffolds.

The ALJ acknowledged that plaintiff suffered from some degree of persistent pain and that his medication caused some side effects.  However, the ALJ again cited the record as a whole did not support plaintiff's subjective statements about the affects of pain.

ALJ Warzycki acknowledged that Dr. Kennedy had opined that plaintiff could not work, but the ALJ did not consider that opinion to be supported by the record as a whole, or Dr. Kennedy's own treatment notes or medically acceptable clinical, laboratory diagnostic evidence.

Although the ALJ found that plaintiff could not perform his past work, given plaintiff's age, education and residual functional capacity, the Medical-Vocational Rules (20 C.F.R. Part

404, Subpart P, Appendix 2, Rule 201.19) suggested a finding of "not disabled."  The ALJ concluded that the sedentary job base was not substantially eroded by  plaintiff's non-exertional limitations, therefore the 2,500 assembler jobs cited by vocational expert Young would be available to plaintiff.  Dr. Israel's contrary vocational opinion, that plaintiff could not sustain substantial gainful activity, was discredited because its premise was not supported by the record as a whole.  Similarly, the ALJ discounted other Agency consults' evaluations where the ALJ found them not supported by the record as a whole.  Consequently, the ALJ ultimately concluded that plaintiff was not disabled at any time.

## The Standard of Review

To be entitled to disability insurance benefits the claimant must establish that he is "disabled" under the Social Security Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  *See Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir.

12

1992); *see also* 20 C.F.R. § 404.1520(b-f).

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. § 405(g).   Thus, the Court must determine not whether plaintiff is in fact disabled, but whether the ALJ's findings were supported by substantial evidence; and, of course, whether any errors of law were made.  *See Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).  The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence" the entire administrative record is taken into consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).  Furthermore, an ALJ may not disregard evidence when there is no contradictory evidence.  *Sample v. Shalala*, 999 F.2d 1138, 1143 (7th Cir. 1993).

A negative answer at any point in the five step analytical process, other than at the third step, stops the inquiry and leads to a determination that the claimant is not disabled.  *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).  If a claimant has satisfied steps one and two, he or she will automatically be found disabled if he or she suffers from a listed impairment (step three).  If the claimant does not have a listed impairment but cannot perform his or her past work, the burden shifts to the Commissioner at step four to show that the claimant can perform some other job.  *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984); *see also Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004) (the burden of proof remains with the claimant through the fourth

13

step).

Although the standard of review applied by this reviewing court requires the ALJ's decision to be supported by substantial evidence, an ALJ utilizes a preponderance of the evidence standard, the default standard in civil and administrative proceedings.  *Jones ex rel. Jones v. Chater*, 101 F.3d 509, 512 (7th Cir. 1996).

### Analysis

Steps 1-4 of the five step analytical framework are not disputed and therefore the Court's analysis will pertain to step 5, regarding whether plaintiff is capable of performing any work within the economy.  There is no dispute that plaintiff cannot perform his past work as an operating engineer, which was heavy, unskilled labor.  Rather, the key dispute is over whether plaintiff has the residual functional capacity for a limited range of sedentary work, as ALJ Warzycki concluded.

"The [Residual Functional Capacity] addressed in a rule establishes the presence of an occupational base that is limited to and includes a full range (all *or substantially all*) of the unskilled occupations existing at the exertional level in question."  **SSR 83-10 (emphasis added).**

> The regulations define sedentary work as involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *By its very nature, work performed primarily in a seated position entails no significant stooping.* Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.  "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required *"occasionally" at the sedentary level of exertion, periods of standing or*

14

> *walking should generally total no more than about 2 hours of an 8-hour workday,*
> *and sitting should generally total approximately 6 hours of an 8-hour workday.*
> Work processes in specific jobs will dictate how often and how long a person will
> need to be on his or her feet to obtain or return small articles.

**SSR 83-10 (emphasis added).**

In attacking that finding, plaintiff essentially argues that the ALJ's conclusion is built upon several errors and is not supported by substantial evidence. Each alleged error will be addressed in turn.

### 1.  Dr. Kennedy's Opinion

Although the caption of plaintiff's argument references all of plaintiff's physicians, not just Dr. Kennedy, it is Dr. Kennedy's opinion that plaintiff could not return to gainful employment which is the focus of plaintiff's argument.  Plaintiff provides a litany of medical opinions from the years preceding the alleged onset date, which are generally irrelevant since plaintiff had been medically cleared to work and was working just prior to October 17, 2005. Otherwise, plaintiff cites, and the Court's focus will be on, Dr. Kennedy's records and related evidence.

Residual functional capacity is an *administrative assessment* of what work-related activities a claimant can perform despite his or her limitations.  *See* 20 C.F.R. § 404.1545(a); and *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001).  "In assessing the claimant's [residual functional capacity], the ALJ must consider both the medical and nonmedical evidence in the record." *Id.*   A treating source's opinion will generally be given controlling weight when that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record. . . ." 20 C.F.R. § 404.1527(d)(2); *Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009).  However, in accordance

with Section 404.1527(f)(2), state agency physicians are deemed experts in Social Security disability evaluation, and an ALJ may rely on their opinions, provided the usual evidentiary support is present and the ALJ explains the weight given to the agency physician's opinion.

The law does not *require* an ALJ to accord a treating physician's opinion more weight than a consulting physician's opinion. *Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009)*; White v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2005); *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992). In either situation, an ALJ weighs conflicting evidence from medical experts, and a reviewing court may not re-weigh the evidence. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). However, "[a]n administrative law judge can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

On March 21, 2007, Dr. Kennedy, plaintiff's orthopaedist, offered an assessment which, if true, could act as the basis for a finding of disability. Plaintiff's persistent pain at the base of the cervical spine (with focal tenderness) was noted; and, according to Dr. Kennedy, plaintiff could sit or stand for no more than an hour at a time, but would subsequently need to lie down for five to ten minutes; plaintiff could lift no more than 10 pounds; overhead lifting was precluded; and plaintiff was limited to only "occasionally" performing activities involving cervical extension. (Doc. 21-1, 16.) Dr. Kennedy characterized plaintiff as having reached a "plateau in terms of improvement," and the doctor further opined that, given the aforementioned restrictions and plaintiff's chronic pain, plaintiff could not return to his former work and was unlikely to be employed in any gainful capacity. (Doc. 21-1, p. 16.)

ALJ Warzycki explained that he declined to give Dr. Kennedy's opinion controlling weight because it was not well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it was inconsistent with other substantial medical evidence in the record.  The ALJ noted that just a month earlier Dr. Kennedy had found that plaintiff had 4+/5 left arm and grip strength, and earlier exams had indicated that plaintiff was generally better, his strength was intact, and that he had normal sensory and motion examinations.  (Doc. 11-2, p. 17.)  The ALJ's opinion also extensively cited Dr. Kennedy's medical notes.  (*See* Doc. 11-2, pp. 12-14.)

The ALJ adequately explained why he rejected Dr. Kennedy's opinion, and one need only review Dr. Kennedy's treatment notes (summarized above and in the ALJ's opinion) to see that Dr. Kennedy's March 2007 opinion is exaggerated relative to the medical evidence and Kennedy's own notes.  By mid-September 2006– just ahead of the 12-month mark after the alleged onset date–  Dr. Kennedy described plaintiff's range of motion as "fairly good" and motor and sensory exams were normal. (Doc. 11-10, p. 25.)  Plaintiff was still in pain, but no longer using pain medication.  (Doc. 11-10, p. 25.)   According to Dr. Kennedy's December 21, 2006, notes, plaintiff was "generally better," but still experiencing some pain at C7-T1; plaintiff's strength was intact; motor and sensory tests were normal; and x-rays showed satisfactory progression of the fusion.  (Doc. 11-14, p. 47.)  In February 2007, plaintiff reported to Dr. Leung that his neck pain was non-radiating and helped by medication.  (Doc. 11-14, p. 129.)  Plaintiff estimated that he could walk one block and lift no more than 5 pounds.  (Doc. 11-14, p. 129.)  However, plaintiff demonstrated no difficulty getting on and off the examination table, or getting up from a chair (Doc. 11-14, p. 131), and his left arm strength was 4+/5; the

right arm was 5/5.  (Doc. 11-14, p. 131.) According to plaintiff's own testimony in 2007, he can carry up to 10 pounds of groceries.  (Doc. 11-2, pp. 30-31.)

Dr. Leung did test and find decreased range of motion in plaintiff's neck and left shoulder (Doc. 11-14, p. 131), but he speculated that plaintiff *could* have difficulty with *prolonged* walking, climbing, and the like (Doc. 11-14, p. 131).  Dr. Leung's opinion is clearly more consistent with the objective evidence and treatment notes.  The Court, like the ALJ, observes that some of the possible impairments Dr. Leung mentioned were contradicted by other evidence.  For example, Dr. Leung opined that plaintiff could have difficulty reaching overhead, but plaintiff stated that he did not have any problem reaching.  (Doc. 11-2, p. 40.)  The ALJ therefore did not wholly adopt Dr. Leung's opinion statement. For the aforestated reasons, the ALJ's decision not to defer to Dr. Kennedy's opinion, despite Kennedy's status as a treating physician, is consistent with substantial evidence in the record.

Insofar as plaintiff focuses on Dr. Kennedy's comment about plaintiff reaching a "plateau in terms of improvement," the Court observes that maximum medical improvement is not dispositive of whether on is "disabled."  The doctor's comment merely begs the core question about residual functional capacity.

### 2.  Plaintiff's Credibility

Social Security Rule 96-7p requires an ALJ to specifically articulate the rationale for any credibility determination relative to the consideration of pain and its functional effects.  ***Brindisi v. Barnhart***, 315 F.3d 783 (7th Cir. 2003).

> The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." ... The

18

> determination or decision must contain specific reasons for the finding on
> credibility, supported by the evidence in the case record, and must be
> sufficiently specific to make clear to the individual and to any subsequent
> reviewers the weight the adjudicator gave to the individual's statements
> and the reasons for that weight.

**Brindisi**, 315 F.3d at 787 (quoting from SSR 96-7p).

After reviewing a variety of evidence, including plaintiff's and his wife's statements vis-a-vis the medical evidence,  ALJ Warzycki did not find plaintiff Engles fully credible with respect to the severity of his symptoms and limitations.  (Doc. 11-2, pp. 11-14.)

Plaintiff argues that plaintiff's treating physicians corroborate plaintiff's allegations.  However, one need only read the examples outlined by plaintiff to see the flaw in that assertion.  The doctors were recording plaintiff's subjective complaints of pain (the phrase "claimant reported,"  but there is not sufficient corroborating evidence.  (*See* Doc. 14, p. 20 (repeatedly quoting records containing the phrase "claimant reported" ).)

Plaintiff argues that plaintiff's persistent pain is not discredited by the mere fact that his strength, and motor and sensory exams were all normal.  The ALJ did <u>not</u> dispute that plaintiff experienced persistent pain; rather, he essentially found that plaintiff had exaggerated his symptoms and the impact of the pain.  (Doc. 11-2, pp. 12 and 16.)  The ALJ considered the *combined* impact of plaintiff's pain and other symptoms with respect to plaintiff's residual functional capacity.  (Doc. 11-2, p. 16.)  Similarly, none of plaintiff's physicians ever distinguished plaintiff's pain from its related physical impact.  Thus, plaintiff's argument is specious.

Moreover, the record is replete with evidence contradicting plaintiff's assertions about his pain and degree of limitation.  Plaintiff claimed that pain affected his ability to concentrate,

but his wife reported that he was able to pay attention for hours, and he handled their banking and bills.  (Doc. 11-6, p. 22.)   Plaintiff claimed his pain affected his ability to interact with others, but plaintiff's wife contradicted him.  (Doc. 11-6, p. 22.)  Plaintiff told Dr. Leung that he could walk no farther than one block, but the doctor observed that plaintiff's gait was within normal limits and plaintiff walked unassisted.  (Doc. 11-14, p. 131.)  In February 2007 plaintiff told Dr. Leung that his pain did *not* radiate and *was* helped by medication.  (Doc. 11-14, p. 129.)

With respect to plaintiff's mental state, Dr. Feinberg did note in late 2005 that plaintiff was "scared out of his mind" (Doc. 11-10, p. 67.), and in March 2006 she described plaintiff as "almost borderline suicidal" and becoming progressively more depressed (Doc. 11-10, p. 65.) However, Mrs. Engles' December 2006 report does not reflect any similar degree of depression. (*See* Doc. 11-6, p. 22.)  In February 2007, plaintiff himself reported no present depression, merely frustration.  (Doc. 11-14, p. 125.)  Although testing did reveal a mildly depressed mood and affect, plaintiff's thought processes were not impacted.  (Doc. 11-14, p. 126.)  Again, as noted above, plaintiff's assertions about the degree of mental affect appears exaggerated when the record is viewed as a whole.  This is particularly so in light of the fact that after the aforementioned low points in late 2005 and early 2006, plaintiff did not receive any psychiatric or psychological treatment and his doctors, including Dr. Feinberg, did not note or pursue any mental health issues.

Dr. Vincent did conclude that plaintiff had a mood disorder secondary to his medical condition, with depressive-like features, but he also concluded that plaintiff's thought processes and ability to focus and stay on task were not affected.  (Doc. 11-14, p. 126.)  Dr. Hollerauer opined, based only on a record review, that plaintiff's activities of daily living were only

20

moderately and/or mildly limited by his depression and chronic pain.  (Doc. 11-14, pp. 137, 140, 144 and 146.)

Plaintiff also argues that his doctors would not have continued to treat him unless they found him credible.  This argument ignores the fact that continued treatment is neither indicative nor dispositive of disability.

The record contains more than ample support for the ALJ's conclusion that plaintiff was not fully credible.

### 3.  Plaintiff's Ability to Perform Other Work

Plaintiff asserts that the substantial evidence in the record shows that plaintiff is not capable of performing any other work, and therefore the Agency did not meet its burden at the fifth step of the disability analysis.   Plaintiff rests this argument on vocational expert James Israel's opinion that, although plaintiff could perform some sedentary or light work, the cumulative effects of plaintiff's physical condition, his age, education and required work site accommodations place plaintiff at an insurmountable disadvantage, compared with other prospective employees who are more work ready.  (Doc. 11-6, 62-63.)  The ALJ completely rejected Israel's opinion because it was based on a hypothetical, and it was not supported by the evidence as a whole.  (Doc. 11-2, p. 18.)

The Court has already extensively analyzed plaintiff's residual functional capacity and the impact of plaintiff's pain and secondary depression, finding the ALJ's findings were supported by substantial evidence in the record.  Therefore, little additional analysis is required. Israel's opinion was premised upon limitations mirroring Dr. Kennedy's March 2007 opinion, which was not supported by the record.  (*Compare* Doc. 21-1, p. 16 *and* Doc. 11-6, p. 62.)

21

Therefore, the ALJ was correct to not give Israel's opinion any weight.  The ALJ relied on the testimony of vocational expert Brenda Young, together with the residual functional capacity the ALJ found was supported by the record.  The ALJ was consistent; just as the ALJ had rejected Israel's opinion, he rejected Young's response to a hypothetical based on Dr. Kennedy's March 2007 residual functional capacity.

Plaintiff does not otherwise attack vocational expert Young's testimony regarding the jobs available to plaintiff based on a residual functional capacity for a limited range of sedentary work, so no further analysis is required.

**IT IS THEREFORE ORDERED**, for the aforestated reasons, that the decision of the Commissioner of Social Security to deny plaintiff Michael Engles' Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423, or even a Period of Disability (POD) pursuant to 42 U.S.C. § 416(i) is **AFFIRMED** in all respects.  Judgment shall enter accordingly.

**IT IS SO ORDERED.**

**DATED: September 13, 2010**

<u>s/ Clifford J. Proud</u>
**CLIFFORD J. PROUD**
**U. S. MAGISTRATE JUDGE**

22